No. 26,670.

THE CITIZENS BANK OF LANE, by WILLIAM DOCKING, Receiver, *Appellee,* v. S. D. NEEDHAM, *Appellant.*

No. 26,673.

THE OSAWATOMIE STATE BANK, by WILLIAM DOCKING, Receiver, *Appellee,* v. C. S. LANPHERE, *Appellant.*

No. 26,678.

THE OSAWATOMIE STATE BANK, by WILLIAM DOCKING, Receiver, *Appellee,* v. G. W. McLAIN, *Appellant.*

No. 26,804.

THE FARMERS STATE BANK OF LARNED, *Appellee,* v. THOMAS KEAST, *Appellant.*

No. 26,805.

THE FARMERS STATE BANK OF LARNED, *Appellee,* v. J. L. DEWEY, *Appellant.*

### SYLLABUS BY THE COURT.

1. BANKS AND BANKING— *Stockholders' Liability — Assessments and Double Liability Distinguished.* Assessment of bank stock to make good impairment of capital, and double liability of stockholders, subserve entirely distinct and wholly different purposes. One is an incident of operation; the other is an incident of liquidation.

2. SAME—*Stockholders' Liability—Effect of Assessment on Double Liability.* Payments made by stockholders to a bank in consequence of impairment of capital, with purpose or effect to repair breach in capital or to keep the bank a going concern, are voluntary payments, however induced, and have no effect to discharge double liability.

Nos. 26,670, 26,673, and 26,678, appeals from Miami district court; JABEZ O. RANKIN, judge.

Nos. 26,804 and 26,805, appeals from Pawnee district court; ROSCOE H. WILSON, judge.

Opinion filed March 6, 1926. Affirmed.

Nos. 26,670, 26,673, and 26,678, *Alpheus Lane* and *Karl V. Shawver,* both of Paola, for appellants.

*Elmer W. Columbia,* of Oswego, for the appellees.

Nos. 26,804 and 26,805, *G. W. Finney, Roscoe E. Peterson,* both of Larned, and *William Osmund, E. C. Cole, T. B. Kelley,* all of Great Bend, for the appellants.

Banks and Banking, 7 C. J. pp. 492 n. 61, 494 n. 85; 23 A. L. R. 1367. Officers, 29 Cyc. p. 1432 n. 14.

*W. H. Vernon, Jr.*, and *J. S. Vernon*, both of Larned, for the appellee.

*T. F. Garver, James E. Larimer, Robert Stone, George T. McDermott, R. L. Webb, Beryl R. Johnson, Ralph T. O'Neil, John D. M. Hamilton*, all of Topeka, *Benj. F. Hegler, A. V. Roberts*, both of Wichita, and *S. N. Hawkes*, of Bartlesville, Okla., as *amici curiæ*.

The opinion of the court was delivered by

BURCH, J.: The plaintiff in each of these cases is an insolvent bank in process of liquidation, suing by its receiver. The defendant in each case is a stockholder of the bank. The purpose of each action was to enforce the stockholder's double liability. Before his bank was finally closed, and while its capital was impaired, each defendant paid to the bank, on account of his stock, which was fully paid up, an additional sum equal to par value of the stock. In each case the judgment of the district court sustained the contention of the receiver that, notwithstanding the previous advancement, double liability subsisted, and was enforceable. The stockholders have appealed.

Because of intrinsic importance of the question, and because conditions of which the court takes cognizance are such that decision of the question is a mater of public importance, the court invited briefs from attorneys representing the receiver and the stockholders of failed banks, in other cases pending in this court, in cases pending in district courts, and in cases not commenced but imminent under the policy adopted by the receiver. The response is most gratifying, and the court is enabled to proceed to determination of the appeals with assurance that it has been fully advised concerning the problem they present.

In the bank of Larned cases, an examination of the bank disclosed that its capital was impaired. The board of directors called a meeting of the stockholders, and at the stockholders' meeting, held on December 8, 1921, the following resolution was adopted:

"Whereas, it appears that the capital stock of the Farmers State Bank has become impaired; and whereas, the bank commissioner of the state of Kansas has notified said bank to make the impairment good within 90 days; and whereas, a special meeting of the stockholders of the said bank has been called for the purpose of making an assessment of the capital stock sufficient to cover the impairment: Now therefore be it resolved, that an assessment of 100 per cent on the capital stock of said bank be made for the purpose of covering the impairment of said stock."

Keast and Dewey paid the assessment on their stock, and the bank continued to do business until September 15, 1922, when it was closed. The stockholders' meeting was attended by deputy bank commissioner Chapman. At the meeting one of the stockholders inquired of Chapman what assurance they had that this assessment would put the bank in good condition, and whether there would be any more assessments. Chapman replied that the assessment would put the bank in good condition. At that time he believed the assessment would put the bank in good condition, and that it would be able to continue to operate.

On January 5, 1922, the stockholders of the bank of Lane unanimously voted an assessment of 100 per cent on the capital stock, and the bank continued to do a general banking business until June 14, 1923. On April 18, 1923, a majority of the stockholders voted a second stock assessment of 100 per cent. The second assessment was not paid, and the bank was obliged to close its doors. The defendant Needham paid the first assessment on his stock. The circumstances under which the first assessment was made are in dispute. The bank's capital was impaired, but no formal notice was sent by the bank commissioner to the bank to make good the impairment, pursuant to the statute providing for such notice. Needham, who was cashier, testified he was told by representatives of the banking department that it would be necessary to make the assessment or close the bank. He further testified that assistant bank commissioner Sandell and deputy bank commissioner Howard made statements to him to the effect that the stockholders might as well try to keep the bank going as to close it; they would be liable to assessment if the bank closed; and by paying an assessment to keep the bank going, they would avoid double liability. Sandell and Howard denied making statements to the effect that assessments to make good impaired capital and keep the bank going would discharge double liability if the bank were subsequently closed, and Sandell's views relating to stock assessment were stated in a letter to the president of the bank dated May 17, 1922, which drew the distinction between an assessment on capital stock and double liability of stockholders:

"The case (relating to repeal by constitutional amendment of the statute imposing double liability on stockholders) is now before the supreme court, and will have nothing to do so far as the requirements are concerned where a bank continues to operate and keep in business. If the bank makes losses,

it becomes necessary for the stockholders to vote an assessment to cover the amount, unless the bank has sufficient earnings to make good.

"If the stockholders do not vote the assessment, then, of course, it is up to the banking department to request that it be made, and should the stockholders refuse to do so, there would be nothing for the department to do but to close the bank.

"You are right in that the pending case in the supreme court only involves the right to sue and recover judgment against the shareholders. It is our opinion that the bank has the authority to make the assessment under the law, and if the assessment is not paid, the stock can be sold."

Howard's report to the bank commissioner, made the day the first stock assessment was levied, showed the bank was in bad condition, but in better condition than it was six months before. The board of directors would not admit that any asset was doubtful except one loan, on which some loss was expected. Howard hoped the bank's surplus of $8,000, and the assessment of 100 per cent on the stock, would take care of losses in sight. As indicated, the bank continued to do business for approximately eighteen months. .

The Osawatomie bank suspended, and was taken in charge by the bank commissioner on February 21, 1922. At that time many banks in the state were failing, and the bank commissioner greatly desired that the Osawatomie bank should not be permanently closed. Examination disclosed the bank was insolvent, but the bank commissioner believed it could reopen if $40,000 in cash were substituted for that amount of bad paper. The bank commissioner conferred with some of the stockholders, who elected to advance $40,000. to the bank rather than suffer an assessment on stock to make good impaired capital. The advancement was made pursuant to a written contract between the electing stockholders and the bank, prepared by the bank commissioner, and executed on March 8, 1922. Portions of the contract follow:

"Whereas, the bank commissioner of the state of Kansas deemed it necessary for said bank above named to make an assessment on its stockholders of a sufficient per cent on its capital stock to raise the sum of forty thousand dollars ($40,000) for the purpose of providing a fund against which may be charged losses of said bank, or in lieu of said assessment provide said fund of $40,000 from some other source, and the parties of the first part hereto having elected to provide said $40,000 themselves instead of having said bank make said assessment, and acting upon said election the parties hereto have paid into said bank as and for said fund the following amounts respectively, towit: [Names and amounts.]

"Now, therefore, The parties of the first part, each for himself, agrees that the sum by him paid into said $40,000 fund, and the whole of said fund, shall

not be a liability against said bank in any event or under any circumstances until all depositors and other creditors of said bank shall have been paid in full, and that at all times the claims of the depositors and other creditors of said bank shall be a lien on the assets of said bank, including said $40,000 fund, prior and superior to the claim or claims of the first parties hereto and each of them."

The contract further provided that in case a stock assessment should subsequently be ordered, the advancement should be applied on the assessment, that in case the financial condition of the bank should improve, a stock assessment might be levied with approval of the bank commissioner to repay the advancement, and that in case of insolvency, those making the advancement should be regarded as creditors, after depositors and all other creditors were paid. Lanphere, defendant in case No. 26,673, contributed $2,500 to the $40,000 fund. He owned five shares of stock of the par value of $100 per share. On March 8, 1922, the bank resumed business. In June, the bank commissioner approved a stock assessment of 100 per cent, which was levied by unanimous vote at a stockholders' meeting held on August 7. The assessment on Lanphere's stock, $500, was offset against the obligation of the bank to him on his contribution to the $40,000 fund. McLain, defendant in case No. 26,678, paid this assessment. He was not a party to the contract, and did not attend the stockholders' meeting which levied the assessment. On April 17, 1923, the stockholders levied an assessment of 200 per cent on the capital stock, but on April 19 the bank closed its doors. Lanphere contended he entered into the contract with the bank on representations of the bank commissioner that he would be relieved of any further liability. McLain made a similar contention with reference to his payment of the stock assessment of August 7, 1922. The assessment repaid part of the contract advancement, and kept the bank open more than eight months.

Throughout the period of economic readjustment following the world war, administration of the banking department of the state was a perplexing task. The disasters peculiar to bank failures were to be avoided if possible. Adequate banking facilities were indispensable to sustain the shock of deflation, and then were indispensable to rehabilitation of industry, trade and commerce; but the service had to be maintained in part through the instrumentality of a lot of weak, crippled, and insolvent banks. Some of them had

been the prey of speculating and dishonest managers.   One expedient resorted to was to induce stockholders standing to lose their original investment and pay double liability, to advance capital to keep the banks open.

The bank commissioner's authority is defined by the banking act, and it contains no provision authorizing him to create any kind of stockholders' liability.   Whenever it appears that a bank's capital stock has become impaired, the bank commissioner shall notify the bank to make good the impairment within ninety days.   He cannot, however, make an assessment on capital stock to make good the impairment.   That must be done by the stockholders, at a stockholders' meeting called by the officers and directors immediately upon receiving the bank commissioner's notice.   (R. S. 9-145.)

Capital stock must all be paid in cash before a bank may receive a certificate of authority to transact business (R. S. 9-104, R. S. 9-105), and must be kept intact as a condition to continuing in business.   It is the imperative policy of the banking law that the capital of any active bank shall be kept unimpaired.   Losses sustained in excess of undivided profits may be charged to surplus, but surplus must be reimbursed from profits before dividends may be declared, and no officer or director may withdraw or permit to be withdrawn, either in form of dividends or otherwise, any portion of the bank's capital.   (R. S. 9-135 and R. S. 9-136.)   When capital has become impaired, the bank may reduce its capital to the extent of the impairment, if such reduction will not place its capital below the minimum required by law.   (R. S. 9-145.)   Unless capital be reduced, the impairment must be made good.   Failure to comply with the order of the bank commissioner authorizes revocation of authority to do business (R. S. 9-124), and whatever a bank may be required to do under penalty of revocation of license, it may lawfully do without order from the bank commissioner.

Conceding to the bank commissioner privilege to exercise sound business judgment in respect to serving notice to make good impairment of capital of a bank striving to do so without a stock assessment and with fair prospect of success, his constant attitude must be that capital must be kept unimpaired.   In practice he may induce assessments for that purpose by calling attention to his plenary authority.   It is conceivable the suggestion may take the form of bald threat.   Should stockholders act on the suggestion, whatever its form, and pursuant to call hold a meeting and levy an

Citizens Bank v. Needham.

assessment, they act voluntarily. In a certain sense there is constraint. The constraint, however, lies in the impairment of capital stock, which must be made good if the bank is to continue in business. The coercion at the bank commissioner's command, threatened or exercised, is lawful coercion, and because it is lawful, it does not constitute business compulsion, or duress under any other name. Only in the event stockholders wait for the bank commissioner's official notice to the bank to make good impairment of capital within ninety days, do they act involuntarily.

Should a stockholder fail to pay an assessment on his stock, the bank may sell the stock. (R. S. 9-107.) The assessment being on stock, the liability is a stock liability, not a personal liability, and the stockholder may choose whether he will pay or suffer his stock to be sold. Sale of the stock to satisfy assessment precludes double liability, because double liability is liability of the owner of stock. Choice of the stockholder to pay or not to pay is his own choice, and if he pays the assessment, he does so voluntarily.

The stockholders contend they paid the assessment on their stocks under representations of the bank commissioner or his subordinates that such payment would discharge double liability. In the case of *Bank v. Laughlin* the district court of Saline county held that the provision of the banking act regarding double liability of stockholders had been repealed by the constitutional amendment of 1906. The appeal from that decision was docketed in this court on July 8, 1921. The case was argued here on January 5, 1922, the day the stockholders of the bank of Lane assessed the stock of their bank. On February 11, 1922, the opinion of this court was filed affirming the judgment of the district court. (*Bank v. Laughlin*, 110 Kan. 559, 207 Pac. 433.) The petition for rehearing was allowed March 17, nine days after the contract between the stockholders of the Osawatomie bank and that bank was signed. The case was heard a second time in this court on May 5, and on June 10 the opinion was filed holding that the statute imposing double liability on holders of bank stock was still in force. (*Bank v. Laughlin*, 111 Kan. 520, 207 Pac. 433.) The petition for rehearing following this decision was denied on July 8, 1922. The result is that from July 8, 1921, to July 8, 1922, it was uncertain whether there was any double liability of holders of bank stock, and part of the time it seemed safe to assume there was no liability other than that attending stock assessment. When it was finally decided that double liability

34—120 KAN.

still subsisted, the question now under consideration was not decided, and the bank commissioner had no more authority to determine it than he had to determine the major question. Conceding, for present purposes, that stockholders were advised, and relying on the advice believed, that payment of stock assessments discharged double liability, the advice consisted of expression of opinion concerning a matter of law. In the case of *State Bank v. Bank Commissioner*, 110 Kan. 520, 204 Pac. 709, the court had under consideration assurances of the bank commissioner that certain certificates of deposit were within the protection of the guaranty fund. In the opinion it was said:

"The bank commissioner could not by contract make the fund liable; the matter of liability was determined by the statute." (p. 530.)

So here, existence of double liability is determined by the statute, and the bank commissioner could not by contract, much less by expression of opinion, discharge that liability. Public officers have no power to alter or modify the effect of positive statutes. (*Burnaman v. Bank Commissioner*, 117 Kan. 612, 614, 232 Pac. 1047.) Creditors entitled to benefit of double liability are not bound by his representations, the stockholders knew the money they paid was not paid for distribution among all creditors, *pro rata*, and payment of a stock assessment is none the less a voluntary payment because of ill-founded belief concerning effect of the payment on double liability. (*Page v. Jones*, 7 Fed. [2d] 541.)

The remaining question is whether payment of stock assessments discharged double liability.

As indicated above, payment in cash of the full amount of capital stock is an essential step in corporate organization. The bank may not begin business until that step has been taken. Impairment of capital works disorganization, and disqualifies the corporation to continue doing business. Stock assessments to make good impairment of capital have for their object repair of the breach in organization, to enable the bank to continue as a going concern. The purpose of double liability is to liquidate claims of creditors after the bank has permanently closed. The constitution, when first adopted, provided as follows:

"Dues from corporations shall be secured by individual liability of the stockholders to an additional amount equal to the stock owned by each stockholder; and such other means as shall be provided by law; but such individual liabilities shall not apply to railroad corporations, nor corporations for religious or charitable purposes." (Art. 12, § 2.)

In 1906 the section was amended to read as follows:

"Dues from corporations shall be secured by the individual liability of the stockholders to the amount of stock owned by each stockholder, and such other means as shall be provided by law; but such individual liability shall not apply to railroad corporations nor corporations for religious or charitable purposes." (Art. 12, § 2.)

The sections of the banking act which provide that shareholders shall be additionally liable for a sum equal to the par value of the stock owned, and provide for receivers' actions to enforce double liability for the benefit of all creditors, relate to the dues from corporations referred to in the constitution. Assessments on capital stock are dues to the corporation, are secured by lien on the stock, and the lien is enforceable by the directors of the bank for the purpose of conserving its own corporate integrity. Therefore, the essential natures of the two liabilities are fundamentally distinct and different from each other, and discharge of one has no relation to discharge of the other.

In this state as elsewhere corporate regulation has been a matter of growth and development. Its history previous to revision of the statutes in 1868 is interesting, but for present purposes a beginning may be made with chapter 23 of the General Statutes of 1868.

The article of the constitution relating to banks and currency applied to banks of issue only (*Pape v. Capitol Bank*, 20 Kan. 440), and has never been utilized. The statutes of 1868 made no provision for organization of banks, and we had no general banking law in this state until 1891. Article 16 of chapter 23 did provide for the organization of "savings associations," and that article, supplemented by pertinent provisions of the act relating to corporations generally, served as a makeshift for a banking law until superseded by chapter 43 of the Laws of 1891. (*West v. Bank*, 66 Kan. 524, 72 Pac. 252.)

Existence of a corporation dated from time of filing with the secretary of state a charter, stating among other things amount of capital stock and number of shares into which it was divided. The charter was a voluntary declaration, signed and acknowledged by five or more persons, which the secretary of state filed and recorded. It was not necessary that all the capital stock should be subscribed, and if not fully subscribed within three months from filing the charter, the directors opened subscription books, advertised for subscriptions, and kept the books open until all stock was subscribed, or until the directors disposed of the residue as the by-laws might pro-

vide. The corporation had five years from the filing of the charter in which to commence business. The board of directors might require payment of stock subscriptions in such installments as the by-laws might direct (G. S. 1868, ch. 23, § 28), and section 29 provided that if any stockholder should neglect to pay any installment as required by the board of directors, the board might declare his stock and all previous payments forfeited to the use of the company. Notice to the stockholder of the proposed forfeiture was provided for.

If execution against property or effects of a corporation were returned unsatisfied, the judgment creditor might procure an order of the court in which the action was brought for execution against any of the stockholders "to an extent equal in amount to the amount of stock by him or her owned, together with any amount unpaid thereon." The creditor might also proceed by action to charge the stockholder with the amount of the judgment (§ 32). On dissolution of a corporation, a creditor whose debt was unpaid might sue any person who was a stockholder at the time of dissolution. If judgment were rendered in favor of the creditor, and execution were satisfied, the defendant stockholder might sue others to recover the portion of the debt for which they were liable (§ 44). Section 46 read as follows:

"No stockholder shall be liable to pay debts of the corporation beyond the amount due on his stock and an additional amount equal to the stock owned by him."

Sections 32 and 44 were interpreted in the case of *Cottrell v. Manlove*, 58 Kan. 405, 49 Pac. 519, as follows:

"The remedies afforded by these two sections cannot be called cumulative, and considered equally open to creditors. One relates to the exigency of corporate insolvency; the other, to that of corporate dissolution. Under one, the proceeding lies because the corporation is bankrupt, though not necessarily dissolved; under the other, because it is dissolved, though not necessarily bankrupt. The remedy of the section last quoted is open to the creditors immediately upon the dissolution of the corporation. Under its provisions, there is no occasion to await the recovery of a judgment against the company, but action may at once be brought against its stockholders." (p. 407.)

In the case of *Abbey v. Dry Goods Co.*, 44 Kan. 415, 24 Pac. 426, it was held that the liability of stockholders under sections 32 and 44 was created for the exclusive benefit of corporate creditors, that the liability was several and not joint, and that each stockholder must be sued separately.

Since the stockholder's individual liability under the statute of 1868 was a liability directly to creditors, it followed that he could do voluntarily what he might be compelled to do. The liability might be discharged by payment in good faith of a *bona fide* debt of the corporation, and if such payment were made, it might be set up as a defense to a subsequent action to enforce the liability. (*Bank v. Milling Co.,* 59 Kan. 654, 54 Pac. 681; *Munson v. Warren,* 63 Kan. 162, 65 Pac. 222.) While the Munson case was decided in 1901, the bank involved closed in 1893, and the judgment of the district court was rendered in 1895, before the law was changed.

At the special session of the legislature held in 1898, sections 32 and 44 of chapter 23 of the General Statutes of 1868, relating to enforcement of stockholders' liability for debts of the corporation, were repealed. For the remedies there provided there was substituted suit by a receiver against all stockholders to collect all unpaid subscriptions to capital stock and to enforce additional liability of stockholders. (Laws Special Session 1898, ch. 10.) Section 46 of the statute of 1868 was amended to read as follows:

"The stockholders of every corporation, except railroad corporations or corporations for religious or charitable purposes, shall be liable to the creditors thereof for any unpaid subscriptions, and in addition thereto for an amount equal to the par value of the stock owned by them, such liability to be considered an asset of the corporation in the event of insolvency, and to be collected by a receiver for the benefit of all creditors." (Laws 1898, Sp. Sess., ch. 10, § 15.)

The statute of 1898 created a charter board to pass on applications for charters and grant certificates of authority to form private corporations, and provided that the corporation should commence active operations within one year from filing its charter, or be deemed dissolved by operation of law. This statute took effect on January 11, 1899.

In the case of *Bank v. Sewing Society,* 28 Kan. 423, it was pointed out that stockholders are not personally liable to creditors of the corporation, except by virtue of express provision of law. In the case of *Woodworth v. Bowles,* 61 Kan. 569, 60 Pac. 331, decided in 1900, this idea was expanded, and it was held that the liability could be enforced in no way except the prescribed statutory way:

"It is a general rule from which, we think, no dissent exists, that, if a statute prescribes a special mode of enforcing the individual liability of the stockholders of corporations, that mode and that alone can be pursued." (p. 577.)

The court held further that the constitutional provision for double liability was not self-executing, but required legislative action to give it effect, and the result is not only that the statutory remedy for enforcing the liability is exclusive, but that without a statutory remedy there is no liability. Taking its cue from the decision in *Woodworth v. Bowles,* the legislature of 1903 repealed the provisions for enforcing liability of stockholders, saving the liability of owners of bank stock, and in 1906 the constitution was amended abrogating double liability, and leaving stockholders liable only to the amount of stock owned, in the absence of legislative action. (*Douglass v. Loftus, Adm'x,* 85 Kan. 720, 119 Pac. 74; *Bank v. Laughlin,* 111 Kan. 520, 207 Pac. 433.)

In 1879, officers of banking institutions were made responsible civilly and criminally for receiving deposits or creating debts when the institution is insolvent or in failing condition, but as indicated above, the first general banking law was enacted in 1891 (Laws 1891, ch. 43). The office of bank commissioner was created, and the system of bank regulation was instituted which has been developed to its present form. Existence of the corporation dated from filing of charter, but until authorized by the bank commissioner, the bank could transact no business except elect officers, approve official bonds, receive payments on account of subscriptions to capital stock, and do such other business as was incidental to organization. It was necessary that all the capital stock should be subscribed, and that fifty per cent should be paid in, before the bank could receive a certificate of authority to do business. Section 6 reads as follows:

"Not less than ten per cent of the residue of the capital stock of such bank shall be paid in each month after such bank shall have been authorized to commence business as aforesaid."

Section 8 was adapted in part from section 29 of the general corporation law relating to forfeiture of stock for nonpayment of installments, and provided as follows:

"Whenever any shareholder, or his assignee, fails to pay any installment on the stock when the same is required to be paid, the directors of such bank may sell the stock of such delinquent shareholder, or as much thereof as is necessary to satisfy the debt, at public auction, after having given three weeks' previous notice thereof in a newspaper published and in general circulation in the city or county where the bank is located, to any person who will pay the highest price therefor, to be not less than the amount due thereon with the expenses of the advertisement and sale; and the excess, if any, shall

be paid to the delinquent stockholder. If no bidder can be found who will pay for such stock the amount due thereon and the cost of the advertisement and sale, the amount previously paid shall be forfeited to the bank, and such stock shall be sold as the directors shall order, within six months from the time of such forfeiture."

Provision was made for maintenance of a reserve fund equal to twenty per cent of deposits. If upon examination the bank were found to be insolvent, it was the duty of the bank commissioner to take charge and notify the attorney-general, who was required to institute proceedings for appointment of a receiver to wind up the bank's affairs for benefit of depositors, creditors, and stockholders. Section 11 read as follows:

"The shareholders of every bank organized under this act shall be additionally liable for the amount of stock owned, and no more."

Double liability of stockholders under this section was enforced under the general corporation law.

In 1897 the act of 1891 was repealed, and a new banking law took its place. (Laws 1897, ch. 47.) Provision was made for a reserve fund equal to 25 per cent of the deposits, and for keeping the reserve intact. Failure to bring up reserve to the required amount on order of the bank commissioner constituted an act of insolvency. Provision was also made for a surplus fund to be created from profits until the fund should equal fifty per cent of the capital stock. Provision was made for appointment of a receiver, at suit of the attorney-general, of any bank found to be insolvent and unable to resume. The provision for double liability contained in the law of 1891 was continued in force in slightly modified form, and section 55 read as follows:

"If, after the expiration of one year from the closing of any incorporated bank, it shall appear to the receiver thereof that the assets of such bank are insufficient to pay its liabilities, it shall be the duty of such receiver to immediately institute proper proceedings, in the name of the bank, for the collection of the liability of the stockholders of such bank; all sums so collected to become a part of the assets of such bank and to be distributed *pro rata* to the creditors thereof, in the same manner as other funds. No action by any creditor against any stockholder of such bank for the recovery of such liability shall be maintained unless it shall appear to the satisfaction of the court that the receiver has failed to commence action as herein provided."

The statute of 1897 required that capital stock should be paid in full before the bank could receive a certificate of authority to commence business, and banks organized under the old law were required to conform to provisions of the new law within six months.

(Concluding portion of section 7 quoted below.) The result of this provision was that, after expiration of six months from the time the law became effective, payment of subscriptions to capital stock in installments after a bank received authority to commence business, became obsolete, and it may be noted here, has never since been permitted.

In the statute of 1897 the requirement that capital stock should be kept intact appeared for the first time in the history of corporate regulation in this state. Sections 33, 34, and 44, which are still the law, read as follows:

"Any losses sustained by any bank in excess of its undivided profits may be charged to its surplus account: *Provided,* That its surplus fund shall thereafter be reimbursed from its earnings, and no dividend shall be declared or paid by any such bank in excess of one-half of its net earnings until its surplus fund shall be fully restored to its former amount." (R. S. 9-135.)

"No bank officer or director thereof shall, during the time it shall continue its banking operations, withdraw or permit to be withdrawn, either in form of dividends or otherwise, any portion of its capital. If losses have at any time been sustained by such bank equal to or exceeding its undivided profits then on hand, no dividend shall be made, and no dividend be declared by any bank while it continues its banking business to any amount greater than its net profits on hand, deducting therefrom its losses, to be ascertained by a careful estimate of the actual cash value of all its assets at the time of making such dividend; the present worth of all maturing paper shall be estimated at the usual discount rate of the bank. Nothing in this section shall prevent reduction of the capital stock of any bank in the manner prescribed herein." (R. S. 9-136.)

"Whenever it shall appear that the capital stock of any bank doing business under this act has been impaired, the bank commissioner shall notify such bank to make such impairment good within ninety days and it shall be the duty of the officers and directors of any bank receiving such notice from the bank commissioner to immediately call a special meeting of its stockholders, for the purpose of making assessment on its stock sufficient to cover the impairment of its capital: *Provided,* That such bank may reduce its capital to the extent of the impairment if such reduction will not place its capital below the amount required by this act." (R. S. 9-145.)

The policy of requiring impairment of capital to be made good by assessment of stock was adopted from the national banking act. (R. S. § 5205, amended June 30, 1876, c. 156, § 4, 19 Stat. 64; U. S. Comp. Stat. 1918, § 9767.)

To provide means for enforcing payment of assessments of capital stock, section 8 of the law of 1891, relating to enforcing payment of installments of subscriptions to capital stock, was utilized in part.

The word "installment" was changed to "assessment," and the section was made to read as follows:

, "Whenever any shareholder, or his assignee, fails to pay any assessment on his stock when the same is required to be paid, the directors of such bank may sell the stock of such delinquent shareholder, or as much thereof as is necessary to satisfy the debt, at public auction, after having given three weeks' previous notice thereof in a newspaper published and in general circulation in the city or county where the bank is located, to any person who will pay the highest price therefor, to be not less than the amount due thereon with the expenses of the advertisement and sale; but said stock so bid for shall at the price bid be first tendered to the other stockholders of said bank at . said price, and if said stock is not taken by the said stockholders or any of them, then said stock shall be sold to the said highest bidder, and the excess, if any, shall be paid to the delinquent stockholder. If no bidder can be found who will pay for such stock the amount due thereon and the cost of the advertisement and sale, the amount previously paid shall be forfeited to the bank, and such stock shall be sold as the directors shall order, within six months from the time of such forfeiture. Any bank heretofore organized under the general corporation law, the capital of which has not been paid in full, shall conform to the provisions of this act within six months after its passage and may for that purpose amend its charter in conformity herewith." (R. S. 9-107.)

In the federal act, what are called by the supreme court of Washington "the power section" and "the machinery section," relating to authority to assess stock and to collect assessments (*Duke v. Force*, 120 Wash. 599), are embraced in a single section.

At the special session of the legislature in 1908, section 28 of the law of 1897 was amended to provide for appointment of receivers of failed banks by the bank commissioner, instead of by district courts in suits commenced by the attorney-general. Such receivers act under direction of the bank commissioner and, if necessary to pay debts of the bank, enforce the individual liability of stockholders (Laws Special Session 1908, ch. 14, § 1). This act was amended in 1913 in two particulars not now important, and as amended appears as R. S. 9-130.

In 1909 section 55 of the law of 1897 was amended to read as follows:

"At any time after the closing of any incorporated bank it shall appear to the receiver thereof that the assets of such bank are insufficient to pay its liabilities, it shall be the duty of such receiver to immediately institute proper proceedings, in the name of the bank, for the collection of the liability of the stockholders of such bank; all sums so collected to become a part of the assets of such bank and to be distributed *pro rata* to the creditors thereof in

the same manner as other funds: *Provided,* That all transfers of property by a stockholder after the closing of any such bank and before the payment of the double liability as provided by this act, shall be absolutely void as against said double liability. No action by any creditor against any stockholder of such bank for the recovery of such liability shall be maintained unless it shall appear to the satisfaction of the court that the receiver has failed to commence action as herein provided." (Laws 1909, ch. 59, § 7.)

The amended section appears as R. S. 9-156. The draftsman of the amendment, interested in prompt action to enforce double liability and in preventing transfer of property which would render action fruitless, did not observe that the concluding portion of the section, which he retained, had lost its vitality. When original section 55 of the Laws of 1897 was enacted, receivers were appointed by district courts in suits brought by the attorney-general. After appointment, they acted on their own responsibility, had no connection with the banking department, and were not accountable to the banking department, except in the matters of submitting to examination and making reports. When in 1908 the bank commissioner was given authority to appoint receivers and to direct and control their activities, self-help on the part of creditors was no longer a desideratum. If it had been, means of self-help had been taken away the year following enactment of the original section. Neither the banking law of 1891 nor the banking law of 1897 gave a creditor of a bank any remedy against a stockholder. The remedy referred to in section 55 was that afforded by the general corporation law. As shown above, that remedy was abolished in 1898, and was abolished without saving to creditors privilege to sue stockholders if the receiver neglected to do so. The result is that the concluding portion of R. S. 9-156 is functionless.

The foregoing legislative history, traced at tedious length, discloses progress from nebulosity to segregate definiteness of two distinct principles applicable to the business of banking: sound operation and sound liquidation at the close of operation.

Payment of capital stock in full in cash before beginning business relates of course to operation. Maintenance of reserve and accumulation of surplus are designed to meet exigencies in operation—demands upon resources beyond those normally to be anticipated, and reduction of resources by unusual or unexpected losses, which if not provided for in advance might cripple or terminate operation. Assessment of stock to make good impairment of capital relates solely to operation. Just as capital fully paid up is deemed essential

to commencement of operation, so full amount of capital kept intact is deemed essential to continued operation. The option which stockholders have of reducing capital to extent of impairment, and the option which the holder of assessed stock has of permitting his stock to be sold or forfeited, show that assessment of stock contemplates continued operation. The obligation to pay an assessment runs to the bank, and the stockholder who pays does so for the benefit and security of the bank as a going concern, and to keep it in operation.

When the principle of keeping capital unimpaired was adopted, double liability was already in existence, and while notions respecting double liability were still crude, the legislature neither superseded it nor substituted stock assessment for it. The next year after stock assessment was adopted, the true conception of double liability became concrete, and the former haphazard preferential and cumbersome method of enforcing it was discarded. The dues to be secured were differentiated, and in effect were defined as dues remaining unpaid at suspension of corporate operation. The security was recognized as belonging to assets for liquidation after suspension. Benefit of the security was extended to all creditors ratably. Enforcement of the security and distribution of benefits were committed to a single agency—a receiver. In 1908 the method of enforcing the liability was perfected by transferring appointment of receivers from the courts to the bank commissioner.

Since there is no double liability of stockholders except the specific kind enforceable in the specific way, provided by the legislature, that liability must be discharged, and not some other. Payment which will discharge that liability may not be made except to the custodian of the fund to be accumulated after suspension of the bank, for the benefit of all those who are then creditors. Stockholders organizing a bank might pay in two dollars for one, and start the bank with a surplus equal to capital. Should they do so, they would do nothing toward discharging double liability. Surplus may be consumed in charging off bad paper or lost in operation of the bank as capital is lost. Double liability is saved by the law as a reserve fund to pay the orchestra after the dance is done. (*State Bank v. Reed*, 114 Kan. 216, 217 Pac. 320.)

The statute provides that "the shareholders of every bank organized under this act shall be additionally liable for a sum equal to the par value of stock owned, and no more." (Laws 1897, ch.

47, § 10; R. S. 9-110.)   As noted above, the banking act of 1891 provided that "the shareholders of every bank organized under this act shall be additionally liable for the amount of stock owned, and no more."   Assessment of stock to make good impairment of capital was not provided for.   When assessment of stock to make good impairment of capital was provided for in the act of 1897, double liability was treated just as it was treated in the earlier act.   Section 11 of the act of 1891 was reënacted as section 10 of the later act, with a slight improvement in phraseology.   Instead of providing that shareholders shall be additionally liable "for the amount" of stock owned, the new provision was that shareholders shall be additionally liable for "a sum equal to the par value" of stock owned. The words "and no more" in the act of 1891 referred to extent of additional liability imposed by the section in which they were used, and their effect was precisely the same when the subject of stock assessment was brought into the law as it was before.   Stock assessment may be repeated as often as capital is impaired.   Double liability comes into existence but once.

The conclusions stated with reference to organic difference between assessment of stock and double liability of stockholders, are derived from an independent consideration of the statutes of this state and the decisions of this court interpreting them.   Other courts have reached the same conclusion with reference to analogous statutes.   The leading case is *Delano v. Butler,* 118 U. S. 634.   Under the act of congress cited above, the comptroller of the currency notified stockholders of a bank that they must assess their stock 100 per cent to make good their entire capital, which had been lost, or go into liquidation.   The assessment was levied, and afterwards payment of the assessment was set up as a defense to enforcement of the double liability provided for by R. S. 5151 (superseded by the federal reserve act of December 23, 1913, c. 6, § 23; 38 Stat. 273), which read as follows:

"The shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares;  . . ." (U. S. Comp. Stat. 1918, § 9688.)

The court held that payment of the assessment could not be applied, either in law or equity, to discharge of double liability.   It is pointed out in one of the briefs filed to assist the court, that the federal statute provided for liability equal to par value of stock

"in addition to the amount invested in such shares"; and it is argued that the words just quoted removed from consideration, when enforcing double liability, amounts invested in stock by way of payment of assessment to repair capital and keep the bank from going into liquidation. The decision of the court in *Delano v. Butler* was not based on that ground. It was based on the essential difference between assessment of stock and double liability.

"The assessment imposed upon the stockholders by their own vote, for the purpose of restoring their lost capital, as a consideration for the privilege of continuing business, and not to avoid liquidation under § 5205 of the Revised Statutes, is not the assessment contemplated by § 5151, by which the shareholders of every national banking association may be compelled to discharge their individual responsibility for the contracts, debts, and engagements of the association. The assessment as made under § 5205 is voluntary, made by the stockholders themselves, paid into the general funds of the bank as a further investment in the capital stock, and disposed of by its officers in the ordinary course of its business. It may or may not be applied by them to the payment of creditors, and in the ordinary course of business certainly would not be applied, as in cases of liquidation, to the payment of creditors ratably; whereas under § 5151 the individual liability does not arise, except in case of liquidation and for the purpose of winding up the affairs of the bank. The assessment under that section is made by authority of the comptroller of the currency, is not voluntary, and can be applied only to the satisfaction of the creditors equally and ratably. If the claim in the present case were allowed, it would follow that in every case payments made by stockholders, for the purpose of restoring the impaired capital, would be considered as credits on the ultimate individual responsibility of shareholders, and the whole efficiency of the provisions of § 5151 for the protection of the creditors of the company at the time of liquidation would be destroyed. The obligations of the shareholders under the two sections are entirely diverse, and payments made under § 5205 cannot be applied to the satisfaction of the individual responsibility secured by § 5151." (*Delano v. Butler,* 118 U. S. 634, 653.)

Cases in accord with *Delano v. Butler* are cited in an annotation, 23 A. L. R. 1367. To the list should be added *Page v. Jones,* 7 Fed. (2d) 541, C. C. A. 8th Cir. 1925. Under some assessment statutes, the stockholder may be held personally liable for the deficiency remaining after sale of his stock to satisfy assessment. In this state, assessment is on stock fully paid up, the statute contemplates forfeiture of stock, and substitution of another stockholder who will bear the burdens of the corporate enterprise, and the remedy to enforce assessment is *in rem* only. No question of obligation of contract is involved in these cases.

The judgments of the district courts are affirmed.