L. R. BAIRD, as Receiver Farmers State Bank of Kathryn, North Dakota, Appellant, .v. OLE J. EIDSVIG, Thomas Gullickson, et al., Respondents.

(230 ·N. W. 721.)

Opinion filed April 26, 1930.

*Conmy, Young & Burnett,* for appellant.

*Kvello & Adams,* for respondents.

BURKE, Ch. J.   On December 10, 1923, the Farmers State Bank of Kathryn closed, and one Jensen, who was cashier of the bank was placed in charge as special deputy bank examiner.

On the 28th of January, 1924, the plaintiff L. R. Baird, as receiver petitioned the district court of Burleigh county for a blanket

order levying an assessment against the Farmers State Bank of Kathryn, together with thirty-seven other banks, and on the 29th of January, 1924, Judge Charles M. Cooley signed such order for the assessment for the full amount of the added statutory shareholders' liability to be levied on the capital stock of said bank, and that said receiver was authorized to fix the date when such assessment should be paid and was required to give notice of said assessment to each of said stockholders.

In August, 1924, the directors of said bank made an application to the Depositors Guaranty Fund Commission to reopen the bank, and on August 9, 1924, the Depositors Guaranty Fund Commission authorized the reopening of the bank upon certain conditions, which in effect required the officers of said bank to remove all doubtful paper, to restore the impaired capital and surplus, to collect and remove all cash items and overdrafts, obtain agreements from all depositors, and where possible, other creditors, to defer the time of payment of their claims; in fact to put the bank in a solvent condition, acceptable to the Commission. Sometime thereafter the Guaranty Fund Commission sent one Desmond as a representative of the said commission to Kathryn to investigate and determine whether the officers of the bank had complied with the conditions imposed by the commission.

About the first of November, 1924, Jensen who was still in charge of the bank as a special deputy bank examiner called up A. E. Jones, district manager of closed banks, by phone at Lisbon, N. D. and requested him to come to Kathryn, as they wanted to reopen the bank.

Jones testified, that at that time he did not know of the order of Judge Cooley for an assessment, but he went to Kathryn and represented the receiver of the bank. All the stockholders were at the meeting which Jones and Desmond attended and Jones testified that, "Desmond said, 'we will get the stock liability, these men are willing to pay it in, and they were all there.' I was there helping the banking department, that was the capacity I was there in. I was interested in opening the bank to this extent, that if I thought it was a good thing for the stockholders I did not want to hinder them as receiver. I collected $17,500 the total amount of stockholders' liability, outside of the Jensen stock which amounted to $7,500. Mr. Desmond wrote the receipt and I signed it as receiver." The Jensens could not pay their

assessment, and it was agreed at the meeting, that if the stockholders would pay the assessment on the Jensen stock, fifty per cent in cash, and fifty per cent by endorsement upon certificates of deposit it would be accepted in settlement. Later $3,750 in cash was paid to Mr. Stortroen who later became cashier and $3,750 was endorsed on certificates of deposit owned by the stockholders who paid for and took over the Jensen stock. Desmond remained in the bank representing the banking department or the Guaranty Fund Commission, and Mr. Jones sent over Mr. Krick and Mr. Eldridge to assist.

Preparatory to the opening of the bank the stockholders were required to take out or make good, bad paper of the face value of a little more than fifty thousand dollars. They entered into an agreement with the stockholders by which the stockholders were to accept thirty-five per cent discount on the face of their certificates of deposits, and for repayment to the stockholders from profits to be made by the said bank in the future. When the bank had complied with all of the conditions necessary for the opening of the bank an application was made by the Guaranty Fund Commission to the court to discharge the receiver, and on the 16th day of December, 1924, the court on the application of the Guaranty Fund Commission, and on the motion of the receiver of said bank ordered that further proceedings in insolvency against said bank be discontinued and that said receiver be discharged, and that said bank be readmitted under the Guaranty Fund.

On the 15th day of December, 1924, L. R. Baird made his report in which he alleged, that the said bank made application to the Guaranty Fund Commission for leave to organize and remedy its condition and be readmitted under the Guaranty Fund; that said commission prescribed conditions as to assets, payment of liabilities and the character and competency of the managing officers to be placed in charge of the affairs of the said bank, and such other requirements as in its judgment is necessary and proper. This final and only report of the receiver relates exclusively to the reopening of the bank. There is not a word in it relating to any assessment or any action of the receiver which in any way related to the liquidation of the bank.

The bank was reopened for business on the 16th day of December, 1924, and the money collected by the receiver together with other collections amounting to $26,574.27 were paid into the bank as an asset

of the bank by the receiver, and the bank continued to operate as a going institution for a little more than three years and was closed again on December 28, 1927.

It is agreed that the bank was insolvent at the time, that its assets were not worth probably $60,000, and that the assets without the stockholders' double liability would not pay the debts.

The plaintiff was again appointed receiver and on March 3, 1928, an order was made by Hon. Thomas H. Pugh, judge of the district court having jurisdiction of the receivership levying and assessing against the stockholders an assessment of $100 on each of their shares. It is agreed that at all times the Farmers State Bank of Kathryn was operating under its original charter, that there was no change in the name, or in the corporation, and that the same bank was closed in December, 1927, also closed in December, 1923, and that all the stockholders who were such at the time the bank first closed in December, 1923, and when it closed in December, 1927, held the same original capital stock certificates, except, that new certificates were issued for the Jensen stock to those who paid the stock liability, and no other assessments were ordered or made, save and except, the order of Judge Cooley in January, 1924, and that ordered by Judge Pugh in March, 1928. The stockholders refused to pay the last assessment and this action is for the recovery of such assessment.

From a judgment in favor of the defendants the plaintiff appeals and demands a trial anew in this court.

It is the contention of respondent, that the stockholders paid one assessment and that they cannot be made to pay again. It is true, that an assessment made for the liquidation of the bank paid by the stockholders for and used to liquidate the bank ends the stockholders' liability; but the evidence in this case clearly shows that the payment made by the stockholders was not a payment for the liquidation of the bank, but was paid for the purpose of enabling the bank to reopen.

Jones, the district manager, of closed banks was called up by the special deputy bank examiner at Kathryn, and asked to come over to Kathryn as they wanted to reopen the bank. When he got there, Desmond a representative of the Guaranty Fund Commission said, "We will get the stock liability they are willing to pay it." This was at a meeting of the stockholders called for what purpose? The liqui-

dation of the bank? No, the opening of the bank, and while they got the stock assessment it was not for the liquidation of the bank but to enable the bank to reopen.

Mr. A. Johnson testifying, said, "Jensen couldn't pay his assessment and I suppose all the stock assessments had to be paid before the bank could be opened." Ques. "So that the money you were paying in was for the purpose of reopening the bank wasn't it?" Ans. "Well really it must most likely have been for that." Ques. "You were not interested in paying any money if the bank was going to stay closed were you?" Ans. "No I wouldn't." Ques. "You were going to pay this money in to help reopen the bank and put it on its feet so as to save your deposit?" Ans. "Yes sir." Mr. Johnson also testified, "Desmond was telling us that we should reopen, that they had collected part of the stock assessment and we should pay some of Jensen's stock and save our deposits. 'If the receiver liquidated,' he said, 'it all seems to disappear' and he finally got us to subscribe. We didn't want to take that stock on account of being liable for another assessment if they should reopen and close again. He said, 'we would not be liable for another assessment, this is a compulsory assessment,' he says, 'and if it closes again you are not liable for another assessment.'" It was stipulated that Eugene Johnson would testify to the same effect.

Jones further testified, "I think I got the bank about November 8, 1924, it was run by the department for a year." Ques. "You did collect some stock liability?" Ans. "Yes." Ques. "And that was under and by virtue of this order of Judge Cooley's was it not, Exhibit 1?" Ans. "I wouldn't say so. They requested me to come up there, and told me they wanted to reopen the bank, and they had a man there to help reopen, and I stayed there about twelve or fourteen hours, and they turned the money in, and I receipted for it, as receiver, but there was no demand for anything. It was on the basis that they were trying to reopen the bank." Ques. "You are not aware of any assessment made by the banking department, are you?" Ans. "I was aware the banking department was there, trying to make a deal with them, and I had gotten it over and had it about five or six days then, and to keep us from finally getting it to keep. I was there helping the banking department, that was the capacity I felt I was there in." Ques. "Your only duty there was as receiver, wasn't it?" Ans. "I

think that's true, yes." Ques. "And you weren't interested in open-ing the bank, were you?" A. "No, I wasn't." Ques. "But you were interested in getting this stock liability paid, weren't you?" Ans. "Yes, but I was interested in opening the bank to this extent, that if I thought it was a good thing for the stockholders in the country, I didn't want to hinder them as a receiver." Ques. "And you weren't hindering them at all, you were simply collecting that which eventually, if that happened, would go back into the bank?" Ans. "Yes." Ques. "Under that, you did collect some money from these stockholders who are defendants in this case?" Ans. "Yes sir." The Court: "Who was Desmond?" A. "He was from the banking department, what they call an inspector." Mr. Adams: "And he was there when you first went there, or were sent there by Mr. Baird, to take the affairs of the bank over, was he not?" Ans. "He was there when I went to take over the affairs." Ques. "Yes." Ans. "No, Desmond wasn't there then." Ques. "Who was there?" Ans. "Jensen had charge for a year before, figuring they would open the bank, don't you see?"

Counsel for the respondent insists, that the action of Mr. Jones was in effect the same as stating to the stockholders, "before you can reopen your bank you must pay your statutory stockholders' liability; if we decide finally to let you reopen your bank what you have paid will go into the bank, but if we do not let you reopen your bank your stock liability is paid." The Banking Department and the Guaranty Fund Commission had decided to permit the bank to reopen on certain con-ditions and Jones was there to assist in the opening. But conceding that counsel is right in his view of the evidence, then the stockholders were not mislead by Mr. Jones. Suppose he did say to them, before you can reopen your bank you must pay your statutory stockholders' liability; and then, if after you have paid the stockholders' liability we decide finally to let you reopen your bank what you have paid will go into the bank; that is, if the bank is reopened, this money you have paid will be paid back to the bank and will become part of its assets, *but if we do not let you reopen your bank your stock liability is paid.* It follows, that if the bank was reopened the stockholders' liability would not be paid. Nothing could be plainer. If they paid the assess-ment and it was used to reopen the bank it was paid for that purpose,

that is, for the purpose of opening the bank and not as a stockholders' liability. It is clear from all the evidence that the stockholders knew that this money was to be used to open the bank if the conditions imposed were complied with, and while the respondents' counsel claims that none of the stockholders knew at any time during the meeting that the bank would be reopened, they did know that they were paying the money for the purpose of opening the bank. It was their meeting and the receiver was there at their invitation trying to help them reopen the bank. It is unfortunate that the bank was not liquidated, but it was reopened by the efforts of the stockholders themselves and continued in business for a period of more than three years.

A case very much in point is the recent case of Citizens Bank v. Needham, 120 Kan. 523, 45 A.L.R. 1202, 244 Pac. 7. The purpose of this action was to enforce the stockholders' double liability. Before the bank was finally closed and while its capital was impaired, each defendant paid to the bank, on account of his stock, which was fully paid up an additional sum equal to the par value of the stock. At the trial the stockholders contended that they paid the assessment on their stock under representations of the bank commissioner or his subordinates that such payment would discharge the double liability. The court said: "Conceding, for the present purpose, that stockholders were advised, and relying on the advice believed, that payments of stock assessments discharged double liability, the advice consisted of expressions of opinion concerning a matter of law."

In the case of American State Bank v. Wilson, 110 Kan. 520, 204 Pac. 709, the court had under consideration assurance of the bank commissioner that certain certificates of deposit were within the protection of the Guaranty Fund. In the opinion it was said: the bank commissioner could not by contract make the fund liable; the matter of liability was determined by the statute. So, here, existence of double liability is determined by the statute and the bank commissioner could not by contract, much less by an expression of an opinion discharge that liability. Public officers have no power to alter or modify the effect of a positive statute, and the statement of the receiver or Desmond to the stockholders to the effect, that if they paid the assessment and reopened the bank there would be no liability in case the bank

failed again, was made without authority of law and did not release or discharge the stockholders statutory liability.

· Burnaman v. Peterson, 117 Kan. 612, 232 Pac. 10-7. "Creditors entitled to the benefit of. double liability are not bound by his representations; the stockholders knew the money they paid was not paid for distribution among all creditors, pro rata, and payment of a stock ·assessment is none the less a voluntary payment because of ill founded belief concerning effect of the payment of double liability . . . The purpose of double liability is to liquidate claims of creditors after the bank permanently closed." Delano v. Butler, 118 U. S. 634, 30 L. ed. 260, 7 S. Ct. 39; Duke v. Force, 23 A.L.R. 1354, and note 1367, (120 Wash. 599, 208 Pac. 67); Page v. Jones (C. C. A. 8th) 7 F. (2d) 541; Smith v. Goldsmith, 50 S. D. 1, 207 N. W. 977; Markus v. Austin (Tex. Civ. App.) 284 S. W. 326; Ragland v. Austin (Tex. Civ. App.) 284 S. W. 330; Andrew v. State Bank, — Iowa, —, 229 N. W. 905.

In the South Dakota case the court said: "We are of the opinion that the voluntary payment of the one hundred per cent stock assessment by respondent in 1921, constitutes no defense to this action. The present action is to enforce a liability which under our constitution and statute is a personal liability and is for the benefit of creditors. The bank itself, or its directors, have no authority over such liability and could neither collect it or release it. The previous one hundred per cent assessment was not a personal liability of respondent, but was merely against the stock. It was not for the benefit of the creditors but for the benefit of the bank as a going concern and consequently for the benefit of the stockholders themselves." Northwestern Trust Co. v. Bradbury, 117 Minn. 83, 134 N. W. 513, Ann. Cas. 1913D, 69; Blackert v. Lankford, 74 Okla. 61, 106 Pac. 532; Farmers State Bank v. Reed, 114 Kan. 216, 217 Pac. 320.

In the case of Markus v. Austin (Tex. Civ. App.) 284 S. W. 326, the court said, "If the commissioner of banking and stockholders of bank enter into an agreement that on payment of assessment restoring impaired capital, stockholders would not be held for assessment provided by Rev. Stat. 1925, art. 535 such agreement was void as against provisions of law and a fraud on the creditors." Commissioner of

Banks v. Cosmopolitan Trust Co. 41 A.L.R. 658 and note (253 Mass. 205, 148 N. E. 609); State Bank v. Gotshall, 51 A.L.R. 1200 and note (121 Or. 92, 254 Pac. 800).

The statutory liability of the stockholders of a bank is fixed by § 5168, Comp. Laws 1913, which reads as follows:

"The shareholders of every association organized under this chapter shall be individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements of such association made or entered into to the extent of the amount of his stock therein at the par value thereof, in addition to the amount invested in and due on such shares. Such individual liability shall continue for one year after any transfer or sale of stock by any stockholder or stockholders."

This is not a liability for the benefit of the bank but it is for the benefit of the creditors. Assessments made to restore impaired capital or the replacement of doubtful paper to make the bank safe, and keep it open and doing business as a going concern is for the benefit of the stockholders and such assessment and payments do not relieve the stockholders from their liability under § 5168, Comp. Laws 1913.

In the instant case, the stockholders knew that the assessment in November, 1924, was for the purpose of opening the bank for business. They had been working with the banking department through special deputy examiner, Jensen, and the Guaranty Fund Commission, to reopen the bank from early in August and their efforts finally culminated in the stockholders' meeting in November which was attended by Jones, and at which, it was determined to pay an assessment. As a result the bank was reopened and continued in business for a little more than three years.

The law does not permit a bank to operate as a going concern without the double liability provided for in § 5168, Comp. Laws 1913. It is intended for the benefit of the creditors in the liquidation of the bank in case of necessity, and assuming that the stockholders in the instant case paid one full hundred per cent assessment on their stock to the receiver, who did not use the proceeds of the assessment to liquidate the bank, but with the knowledge and consent of the stockholders paid the same into the bank as a part of its assets, and to enable it

to reopen, and since the bank did reopen and continued as a going concern the stockholders' liability was not discharged.

It follows, that the judgment of the district court must be reversed, and judgment ordered for plaintiff as prayed for in the complaint, and for costs. It is so ordered.

NUESSLE, CHRISTIANSON, BIRDZELL, and BURR, JJ., concur.